# EXHIBIT 2

# *INDIANA COMMERCIAL COURT*

| | | |
|---|---|---|
| STATE OF INDIANA | ) | MARION COUNTY SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO. 49D__-2101-PL-_____ |

| | |
|---|---|
| STEAK N SHAKE INC. (F/K/A STEAK N SHAKE OPERATIONS, INC.), | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| FORTRESS INVESTMENT GROUP LLC, | ) ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff Steak n Shake Inc., f/k/a Steak n Shake Operations Inc. ("Plaintiff" or "Steak n Shake" or the "Company") for its Complaint against Fortress Investment Group LLC ("Defendant" or "Fortress"), alleges and states as follows:

### NATURE OF THE ACTION

1.      Steak n Shake is a restaurant chain headquartered in Indianapolis, Indiana. Steak n Shake brings this action to recover damages against Fortress, a New York-based investment firm engaged in leveraged buyouts, hedge fund management, vulture investing, and other financial strategies. As explained in more detail below, Fortress obtained sensitive and confidential business information from Steak n Shake after agreeing not to use that information to disadvantage the Company or for any reason other than to consider a potential real estate deal. Fortress then ignored its promise and used that confidential information to acquire a majority of Steak n Shake's outstanding debt with the intent of acquiring the Company. In so doing, Fortress breached its agreement with Steak n Shake. This scheme has cost Steak n Shake millions of dollars and countless hours of management attention at a

critical time, with the COVID-19 pandemic raging across the country and the Company in the midst of transitioning its service model. Fortress must be held to account for its breach, and for its bad faith conduct.

2.      Like many restaurant chains, Steak n Shake has been deeply affected by the COVID-19 pandemic. As a result of government-mandated restrictions on indoor dining, the Company was forced to shut the dining rooms of many of its restaurants across the country. The resulting cash crunch was particularly acute because Steak n Shake began 2020 with $181,498,000 in term loans outstanding that were set to mature in March 2021 (as defined below, the "Loans").

3.      In early 2020, the Loans were trading at a significant discount to their face value. In April 2020, Moody's downgraded its credit rating on the Loans to "Ca," meaning that Moody's believed that the Loans were "likely in, or very near, default, with some prospect of recovery in principal and interest." In its accompanying report, Moody's noted "given the material deterioration in earnings, cash flow and credit metrics driven by the restrictions and closures across its restaurant base due to the efforts to contain the spread of the coronavirus." The downgrade caused the Loans to trade at an even greater discount. Steak n Shake, which had been negotiating with its lenders and offering to repurchase outstanding Loans, continued its attempts to retire the debt at market prices.

4.      Separately, Steak n Shake's management had concluded in 2019 that to be best-positioned for success, the Company needed to transition its restaurants from a table-service model to a self-service model. That transition would require additional capital.

5.      Unlike many restaurant chains, Steak n Shake owns much of the real estate on which its restaurants are built. In the summer of 2020, Steak n Shake decided to explore

raising cash by selling a portfolio of fifteen real estate properties with the restaurants included (as defined below, the "Properties"). Steak n Shake developed a sale process for the Properties, engaged a marketing agent, and populated a digital data room with confidential information.

6.     In July 2020, Fortress expressed interest in purchasing the Properties. Fortress is a large institution with several different investment strategies, so its interest in the Properties seemed bona fide at the time. In hindsight, however, it appears that Fortress never planned to purchase the Properties. Instead—as discussed in more detail below—Fortress used its supposed interest in the Properties as a Trojan horse to obtain confidential information about Steak n Shake itself as part of a strategy to take over the entire Company.

7.     Before commencing negotiations and providing Fortress with access to confidential information to perform its purported due diligence on the Properties, Steak n Shake insisted that Fortress sign a non-disclosure agreement that would preclude it from using any of Steak n Shake's confidential information to the Company's detriment. Fortress agreed, and on July 17, 2020, Fortress executed a Mutual Confidentiality Agreement (as defined below, the "MCA"). In the MCA, Fortress acknowledged that the confidential information it received from Steak n Shake was uniquely valuable and agreed to not use the information "to gain a competitive or other advantage" over Steak n Shake, **or for any purpose** "other than to assist in [Fortress's] internal analysis and evaluation" of its potential purchase of the Properties. Fortress further agreed that this proscription applied to its affiliates and would remain in place for one year.

8.     In reliance on the commitments in the MCA, Steak n Shake began providing Fortress with confidential information. Fortress received information regarding, among

other things: the status of the marketing and sale process for the Properties; the number of

potential purchasers who had surfaced to conduct diligence on the Properties; the level of

interest being shown by those potential buyers; the Company's plan to conduct an auction

of the Properties; and the status of the Company's negotiations with its lenders, whose

permission would be required for a sale because the Properties were part of the collateral

securing the Loans.  Steak n Shake also gave Fortress access to a digital data room containing

confidential property-level information.   Steak n Shake never would have provided this

confidential information to Fortress if Steak n Shake knew that Fortress would misuse it for

purposes other than considering the purchase of the Properties. But that is exactly what

Fortress did.

9.     Fortress did not purchase the Properties.  Instead, Fortress repeatedly changed

the terms of its offer and made demands that effectively stalled the transaction.  And, at

around the same time that Fortress entered into the MCA and began receiving Steak n

Shake's confidential information, it surreptitiously began buying Loans from other investors.

Fortress and its affiliates eventually accumulated more than $89 million in face amount of

Loans, which represented more than 50% of the total outstanding Loans.  Armed with Steak

n Shake's confidential information, Fortress paid an average price of about 90% of the face

amount of the Loans, which was a significant premium over where the Loans had been

trading.

10.     Fortress then announced to the Company and the other Lenders that it would

not accept a negotiated repayment on the Loans.  Instead, Fortress said it would either force

the Company to repay the Loans in full or file for bankruptcy, in which case Fortress intended

4

to "take the keys" to the business via a "credit bid," *i.e.*, tendering the face amount of the Loans in lieu of cash to purchase the Company.

11.     With the benefit of hindsight, Fortress's strategy has become clear: it never intended to buy the Properties; Fortress wanted to buy Steak n Shake.  In other words, when Fortress entered into the MCA in July 2020, it was not to kick the tires on a potential real estate transaction, but to perform due diligence on the Company itself.

12.     The Loans that Fortress purchased were secured by substantially all of Steak n Shake's assets.  If Fortress could reliably estimate the value of the collateral, then it could effectively establish a "floor" for its investment, *i.e.,* the minimum amount that would be recovered in the event that Steak n Shake could not repay the Loans.  The market perceived that the majority of the value in the collateral securing the Loans rested in Steak n Shake's real estate portfolio.  So, Fortress would have wanted to learn as much as it could about the value of that real estate.

13.     The property-specific information that Fortress received—as well as other valuable information that Steak n Shake provided—enabled Fortress to, *inter alia*, extrapolate the value of Steak n Shake's total real estate portfolio, understand how the Company was handling the sale process, assess the likelihood that Steak n Shake would be able to sell the Properties, and ascertain the status of the Company's negotiations with the lenders that would need to approve a sale of the Properties.  All of this information would be helpful in assessing a potential takeover of the Company.

14.     Fortress's subsequent willingness to pay more for the Loans than other sophisticated institutional investors begs an obvious question: what did Fortress know that those other investors did not?  The answer is obvious—Fortress had access to confidential

information, provided by Steak n Shake in the context of the proposed real estate transaction that other investors lacked.

15.    In fact, although Steak n Shake did not know it at the time, Fortress was in restaurant acquisition mode last year.  In May 2020, Fortress purchased the secured debt of two other restaurant chains and subsequently used that debt to seize control of each.  In each case, the target company had experienced liquidity issues as a result of COVID-induced restaurant closures that affected their ability to repay maturing debt.  And in each case, Fortress purchased secured debt at a discount and, when the company was unable to repay the debt and was forced into bankruptcy, Fortress used its position as a secured lender to take control.

16.    So, Fortress appears to have deliberately targeted the restaurant industry with this loan-to-own strategy.  But Fortress's brazen use of Steak n Shake's confidential information to target Steak n Shake was precisely what the MCA was intended to prohibit and constitutes a clear breach of that agreement.  Fortress continued its bad faith conduct when, within weeks of signing the MCA, it began using Steak n Shake's confidential information to purchase the Loans through an opaquely named affiliate that obscured Fortress's involvement. And, when Fortress eventually did purchase the Loans through entities that could be traced to Fortress, it did so quickly so that it could purchase a majority of the Loans before its involvement would be detected.  Fortress's conduct was a clear breach of its obligations under the MCA, and has caused significant damage to Steak n Shake, for which Fortress should be held liable.

**PARTIES**

17.     Plaintiff Steak n Shake is an Indiana corporation with its principal place of business at 107 S Pennsylvania St., #400, Indianapolis, Indiana, 46204.  Steak n Shake is a fast-casual restaurant chain, with 337 locations in 16 states as of June 30, 2020.

18.     Fortress is a Delaware limited liability company based in New York.

**JURISDICTION AND VENUE**

19.     This Court has personal jurisdiction over the parties pursuant to Indiana Trial Rule 4.4, which confers jurisdiction over residents and non-residents who conduct business within the State.  In addition, this Court has personal jurisdiction over Fortress because both parties agreed in the MCA to submit to the exclusive jurisdiction of the "state or federal courts located in Marion County, Indiana" with respect to "any judicial action for enforcement of or relating to" that agreement.  This Court also has subject matter jurisdiction over this action.

20.     Venue is proper in this Court pursuant to Indiana Trial Rule 75 and pursuant the parties' agreement to the exclusive jurisdiction of the state or federal courts located in Marion County, Indiana.

21.     Pursuant to Rule 2 of the Indiana Commercial Court Rules, this case is eligible for assignment to the Commercial Court Docket.

**FACTUAL BACKGROUND**

**A.     The Loans and Credit Agreement**

22.     On March 19, 2014, Steak n Shake and two of its subsidiaries entered into a Credit Agreement through which certain lenders (the "Lenders") agreed to extend $220,000,000 of credit in the form of term loans to the Company.  The Loans mature on

March 19, 2021, and are secured by Steak n Shake's assets, including real property that it owns and uses to operate its restaurants.

23.     Under Section 9.01(a) of the Credit Agreement, the Lenders appointed an Administrative Agent and Collateral Agent to act as the Lenders' agent with respect to the Loans.  The original Administrative Agent and Collateral Agent was Jefferies Finance LLC, although Wilmington Trust subsequently assumed those roles.

24.     Section 9.01(b) of the Credit Agreement provides that the Administrative Agent is permitted to "credit bid and purchase" any collateral for the Loans, but only if the "Required Lenders" instruct it to do so.  Credit bidding allows a secured creditor to bid for and purchase collateral using the debtor's outstanding debt as all or part of the purchase price.  Because secured creditors often purchase their debt holdings at a discount prior to a foreclosure or bankruptcy but receive credit for the full face amount of the outstanding debt in connection with any bid, a credit bidder has an advantage over other potential bidders, who must offer the full purchase price in cash.

**B.     Steak n Shake Negotiates With Its Creditors to Retire the Loans**

25.     In early 2020, the Loans were trading at a discount to face value.  In April 2020, Moody's downgraded its credit rating on the Loans to "Ca," which meant that Moody's believed that the Loans were "likely in, or very near, default, with some prospect of recovery in principal and interest."  Moody's explained in its accompanying report that:

> The downgrade reflects the expectation that Steak n Shake will face extreme challenges in addressing the March 2021 maturity of its term loan at par and on economic terms given the material deterioration in earnings, cash flow and credit metrics driven by the restrictions and closures across its restaurant base due to the efforts to contain the spread of the coronavirus.

26.     The downgrade caused the Loans to trade at an even greater discount.  Steak n Shake began negotiations with Wilmington Trust and the Lenders to potentially retire the Loans prior to the maturity date at the market price.  When these negotiations began, there was $181,498,000 in remaining principal outstanding on the Loans and, critically, no Required Lenders with enhanced rights under the Credit Agreement.

27.     Steak n Shake was successful in retiring certain of the Loans.  In February 2020, the Company repurchased and retired approximately $21 million of loans at 80% of face value.  In April 2020, the Company retired approximately $5 million of loans at 73% of the face amount.  The Company continued to negotiate with the Lenders through the parties' respective advisors in the ensuing months.

**C.     Steak n Shake Decides to Sell Properties to Finance a Transition of its Service Model**

28.     At the same time that Steak n Shake was engaging Wilmington Trust and the Lenders with respect to retiring the Loans, it was also transitioning its service model from table service to self service.  Two years earlier, Steak n Shake's management had concluded that a self-service model would reduce operating costs while also matching evolving consumer preferences, and thus would be more profitable in the future.

29.     Government-mandated restrictions on indoor dining resulting from the COVID-19 pandemic made the need to implement that transition more acute.  Steak n Shake management concluded that to be competitive going forward, it needed to re-emerge post-COVID with its new service model in place.

30.     In an effort to help finance this transition, Steak n Shake decided to explore selling a portion of its real estate portfolio.  In the summer of 2020, Steak n Shake identified

9

fifteen (15) of its properties (the "Properties") to sell.  Each of these Properties constituted a portion of the overall collateral securing the Loans.

31.     Steak n Shake then began preparing to market and sell the Properties.  The Company gathered data and information regarding each of the Properties, engaged outside advisors, including a marketing agent, and designated Company personnel to lead and coordinate the process.  Steak n Shake also populated a secure, confidential data room with specific, property-level information regarding the Properties.

### D.     Fortress Expresses Interest in the Properties

32.     In mid-July, Steak n Shake's marketing agent informed the Company that Fortress was potentially interested in bidding on all of the Properties as a collective unit, as well as additional restaurant properties in the future.

33.     Founded in 1998, Fortress is an investment management firm based in New York.  According to its website, Fortress currently manages approximately $50 billion in assets focused on several different strategies, but the bulk of its assets appear to be invested in private equity, *i.e.*, acquiring and running businesses with a view towards selling them at a profit.

34.      It appears that, in 2020, Fortress identified the restaurant industry as a source of distressed takeover opportunities and sought out restaurant chains with large impending debt maturities.  In furtherance of this strategy, in May 2020 Fortress, through its affiliate SPB Hospitality, LLC ("SPB"), purchased Craftworks Parent LLC ("Craftworks"), a company that owned and operated several chains, including Logan's Roadhouse and ChopHouse & Brewery, in a bankruptcy auction.  Fortress bought Craftworks' senior secured debt at a discount to its face value.  When Craftworks subsequently filed for

bankruptcy, Fortress purchased the entire company using the face amount of that debt—$93 million—as a credit bid.  The $93 million credit bid was $45 million less than Fortress had offered for the Craftworks business just two months before.

36.     Also in May, Fortress purchased substantially all of the assets of another restaurant chain, The Krystal Company ("Krystal"), out of bankruptcy using a $27 million credit bid as consideration for its purchase.  As Fortress's counsel explained, Fortress purchased Krystal's debt from other lenders and then used that debt to structure a credit bid and negotiate the purchase of the company's assets.  (*See* https://www.alston.com/en/insights/news/2020/06/fortress-investment-group-acquires-krystal/) (last visited: February 17, 2021).)

36.     In the summer of 2020, with the acquisitions of Craftworks and Krystal under its belt, Fortress turned its attention to Steak n Shake.  It was then that Fortress first expressed interest in purchasing the Properties.

### E.     Steak n Shake And Fortress Enter Into The MCA

37.     Having learned of Fortress's purported interest in the Properties, the Company scheduled an introductory phone call with Fortress and its advisors on July 16, 2020.  Before sharing any confidential information, however, Steak n Shake insisted that Fortress sign a non-disclosure agreement. Following that call, Steak n Shake and Fortress negotiated and executed a Mutual Confidentiality Agreement (the "MCA").  A true and accurate copy of the MCA is attached hereto as Exhibit A.

38.     The MCA recites that Steak n Shake and Fortress "may provide certain information to each other . . . in connection with one or more potential real estate transactions between them," which the parties defined as the "Potential Transaction." (Ex. 1 ¶ 1.) Steak

n Shake and Fortress further agreed that each "desires to permit the other to conduct due diligence and analysis in connection with each Potential Transaction while maintaining, in accordance with this Agreement, the confidentiality of information provided by" the disclosing party.  (*Id.*)

39.   The parties defined "Confidential Material" broadly to include

> all confidential and/or proprietary business, financial, technical or other information of the Disclosing Party or its Affiliates (whether or not designated as confidential) furnished on or after the date hereof (whether orally, visually, electronically or in writing or other tangible medium) by or on behalf of the Disclosing Party to Recipient, its Affiliates or Representatives (as defined herein) in connection with or relating to any Potential Transaction.

(*Id.* ¶ 2.)

40.   The Parties further agreed that Confidential Material

> will include, without limitation, all term sheets and other information relating to a Potential Transaction, reports, documents, trade secrets, technology, product information, recipes and production methods, software, source code, financial statements, financial projections, other financial information, plans, processes, procedures, inventions, know-how, marketing, strategies, forecasts, suppliers, contractors, consultants, purchasing information, customer and pricing lists, studies, contracts and agreements, and any and all analyses, compilations, forecasts, studies, notes or other documents prepared by the Recipient or the Disclosing Party based upon or containing any such information; excluding, however, any such information that: (i) is previously and lawfully known to Recipient or is publicly available or in the public domain at the time disclosed; (ii) becomes publicly available or enters the public domain through no fault of Recipient in breach of this agreement; (iii) becomes available to Recipient or its Representatives from a source, other than the Disclosing Party, its Affiliates or Representatives, whom the Recipient, after reasonable inquiry, does not know to be subject to a legally enforceable restriction against disclosure to the Disclosing Party with respect to such information; (iv) is independently developed by Recipient without reference to or application or use of any Confidential Material; or (v) is specifically approved in writing for release or disclosure by the Disclosing Party without restriction.

(*Id.*)

41.    Fortress acknowledged and agreed that Steak n Shake's "Confidential Material is a very valuable company asset." (*Id.* ¶ 3.) Fortress further acknowledged and agreed that "[t]he misuse or improper disclosure of such Confidential Material could cause [Steak n Shake] significant competitive injury." (*Id.*) Fortress therefore specifically agreed (1) to use the Confidential Material it received from Steak n Shake only for the purpose of considering a Potential Transaction, (2) not to use the Confidential Material to disadvantage Steak n Shake or for any other purpose, and (3) to ensure that anyone within Fortress who received Steak n Shake's Confidential Material would be informed of this obligation and directed to comply with it:

> Each Recipient agrees (i) to treat as confidential in accordance with this Agreement all Confidential Material received from the Disclosing Party, (ii) not to disclose the Confidential Material received from a Disclosing Party, and to take commercially reasonable precautions to prevent such Confidential Material from being disclosed, to anyone other than to its and its Affiliates' employees, subcontractors, officers, directors, managers, partners, potential financing sources, agents, consultants, professional advisors, members, attorneys, and representatives of Recipient or its Affiliates (each a "Representative") who are assisting in the due diligence or analysis on behalf of Recipient relating to a Potential Transaction and have a need to know such Confidential Material; (iii) *not to use such Confidential Material or knowledge or information gained through review of Confidential Material to gain a competitive or other advantage over the Disclosing Party or for any purpose other than to assist in the internal analysis and evaluation by Recipient of the Potential Transaction*; (iv) not to disclose to any person or entity other than a Representative that discussions or negotiations are contemplated or taking place regarding any Potential Transaction or any of the terms, conditions, or other facts with respect to a Potential Transaction, including its status, except as required by law; and (v) *to ensure that each of its Representatives is informed of the confidential nature of the Confidential Material and is directed to comply with, all of the terms of this Agreement.*

13

(*Id.* (emphasis added).)

42.     Fortress's obligations not to misuse the Confidential Material applied to Fortress and all of its affiliates and extends until July 21, 2021. (*Id.*)

43.     As discussed below, upon information and belief, Fortress had no intention of buying the Properties and never intended to comply with its obligations under the MCA. Instead, Fortress always intended to use the confidential information to buy the Loans with a view towards acquiring the Company at a discount—just as it had done with two other restaurant chains in 2020.  By signing the MCA, Fortress induced Steak in Shake to share confidential information regarding the Company as well as the Properties themselves, both of which could prove useful in valuing the Loans' collateral and thus in setting a floor for Fortress's investment.

### F.     Fortress Submits a Letter of Intent and Conducts Due Diligence

44.     On July 17, 2020, Fortress provided a non-binding letter of intent to Steak n Shake.  Fortress's letter offered a purchase price of $8 million for the Properties and provided for a 30-day due diligence period.  Fortress also required a 60-day period of exclusivity that prohibited Steak n Shake not only from offering the Properties for sale to any other party, but also from discussing or negotiating any potential transactions regarding the Properties with any other party, upon pain of a $500,000 "termination fee."

45.     During the ensuing weeks, Steak n Shake and Fortress engaged in an extensive dialogue regarding a potential purchase of the Properties.  The Company and its advisors had several discussions with Fortress and its advisors and provided Fortress with a significant amount of information regarding the Properties, including the status of the marketing and sale process for the Properties, the number of potential purchasers who had

surfaced to conduct diligence on the Properties, the level of interest being shown by those potential buyers, and the Company's plan to conduct an auction of the Properties.

46.     On July 27, 2020, executives from Steak n Shake and Fortress held a telephone call, ostensibly to discuss a potential sale of the Properties.  During that call, Steak n Shake's senior management shared confidential information with Fortress about Steak n Shake's business strategy, including details on Steak n Shake's plan to sell the Properties to invest in modernizing its restaurants, as well as issues that Steak n Shake was having with the Lenders.  The Company and Fortress also discussed Steak n Shake potentially selling additional properties to Fortress, in the context of this or a possible subsequent transaction. Steak n Shake's executives shared this confidential information with their counterparts at Fortress in good faith to provide context around the sale of the Properties and the timing of the proposed transaction—and only because Fortress had signed the MCA.  At the time, Steak n Shake had no idea that Fortress actually intended to use that information to decide whether to buy the Loans as a strategy to take control of the Company at a discount.

47.     Following that call, Steak n Shake provided Fortress with a link to a digital data room containing confidential due diligence materials.  These materials consisted of data and documents related to the Properties, including land surveys, title commitments, declarations of lot restrictions, property digests, elevation certificates, and Phase I Environmental Site Assessments.

48.     Steak n Shake supplemented the documents in the digital data room on July 29, 2020.  These additional materials included tax notices and financial information related to outstanding taxes on some of the Properties.  As with the other documents in the digital

15

data room, Steak n Shake considered this information to be "Confidential Material" under the MCA.

49.     On July 30, 2020, Fortress sent Steak n Shake a revised letter of intent to purchase the Properties for $7 million.  The revised letter of intent proposed to extend the due diligence and exclusivity periods contemplated in the previous letter of intent to August 24, 2020, and provided Fortress with the option to extend the exclusivity period another 10 days at its sole discretion.  Fortress continued to demand a $500,000 "termination fee" in the event Steak n Shake engaged in discussion with other potential buyers.

50.     Despite demanding that Steak n Shake not negotiate with—let alone sell the Properties to—any other parties, Fortress ultimately did not purchase the Properties.  Instead, Fortress used Steak n Shake's confidential information to purchase the Loans with an eye towards gaining control of the entire Company.

### G.     The Confidential Information Was Valuable To Fortress

51.     As a participant in the sale process, Fortress was given a significant amount of confidential information that would be useful to an investor considering buying the Loans and potentially the Company.  This confidential information—which included property-level data as well as other competitively sensitive information about the Company—made it possible for Fortress to extrapolate the value of the Company's total real estate portfolio, gain insight into how the Company was handling the sale process, assess the likelihood that Steak n Shake would be able to sell the Properties, and learn the status of the Company's negotiations with the Lenders that would need to approve a sale of the Properties.

52.     This information was highly relevant to an investor considering buying the Loans.  The market perceived Steak n Shake's real estate portfolio to represent the bulk of

the value of the collateral securing the Loans.  The fact that the Loans were trading at a significant discount to their face amount indicated that investors believed there was a significant risk that the collateral securing the Loans would be insufficient to pay the Loan holders in full in the event of default.  If Fortress could develop a reliable, independent valuation of Steak n Shake's real estate portfolio, then it could also develop an effective "floor" for the value of the Loans, *i.e.*, an assumption of the minimum amount that would be available to Lenders in the event they foreclosed on the collateral securing the Loans.  That information, which was unavailable in the market, would be tremendously valuable in deciding whether to purchase Loans, and at what price.

53.     Additionally, in the course of their discussions, Steak n Shake and its advisors conveyed information to Fortress regarding the Company's business operations, what was motivating the Company to sell the Properties, how the sale fit within the Company's overall strategy, the relationship between the Company and the Lenders who would need to approve the sale and the status of negotiations between them, and a variety of other things.  This information would be critical in forming an opinion about the prospects for the overall business and whether it was worth owning.

54.     This is the sort of information that a seller would provide in the ordinary course to a potential purchaser of real estate, but that no company would ever provide to a lender or third party considering a takeover with a credit bid.  Steak n Shake would never have provided this information to Fortress had it known that Fortress would use the information to the Company's detriment in violation of the MCA.

17

**H.**    **Fortress Purchases a Majority of Steak n Shake's Loans
And Threatens To "Take The Keys" to the Company**

55.    Not coincidentally, in the weeks after Fortress executed the MCA and began

receiving confidential information about the Properties, it also began buying Loans without

Steak n Shake's knowledge.  Tellingly, Fortress did not initially buy Loans in its own name

or in the name of any of the funds that it manages.  Instead, Fortress hid its involvement by

purchasing the Loans through a joint venture called BJC Ventures LLC.  And when Fortress

finally did begin buying the Loans through other investment funds that could be traced back

to Fortress, it did so quickly to prevent Steak n Shake from detecting Fortress's involvement

before Fortress controlled a majority of the Loans outstanding and held the powers of the

Required Lenders under the Credit Agreement.

56.    Fortress now owns more than $89 million in face amount of Loans through

BJC Ventures LLC as well as four other investment funds that it manages: Drawbridge

Special Opportunities Fund LP, Drawbridge Special Opportunities Fund Ltd., DBSO TRG

Fund (A) LP, and Fortress Vintage Securities Fund, L.P.

57.    Steak n Shake was shocked by Fortress's brazen disregard for its obligations

under the MCA and the manner in which it purchased the Loans.  The Company had given

Fortress its confidential information under the express condition that none of that

information could be used **for any purpose whatsoever** other than to consider a purchase

of the Properties.  Fortress becoming the majority holder of the Loans and threatening to take

over the Company is precisely the sort of situation the MCA was designed to prevent.  Yet

Fortress had done exactly what the MCA proscribed.

58.    Moreover, Fortress purchased these Loans at a substantial premium to the

prevailing market prices.  Fortress's willingness to pay more than other investors strongly

suggests that Fortress had information that other sophisticated market participants did not. And, of course, Fortress **did** have information that other Lenders did not—the confidential information it had been given by the Company under the guise of being interested in buying the Properties after entering into the MCA in bad faith.

59.     Steak n Shake's management thought they were providing this information to a potential counterparty to a real estate transaction, not to a vulture investor who would use it to purchase the Company's debt and potentially seize control.

60.     Because Fortress and its affiliates are now the "Required Lenders" under the Credit Agreement, Fortress had the right to direct the Administrative Agent to credit bid the entire amount of all the Lenders' debt at par value to purchase the collateral—a right that has substantially increased its negotiating leverage vis-à-vis Steak n Shake.

61.     Fortress wasted little time putting its ill-gotten leverage to use.  After achieving Required Lenders status, Fortress made known that it would not accept Steak n Shake's proposed terms.  Instead, Fortress threatened to force Steak n Shake into bankruptcy, at which point Fortress would direct the Administrative Agent to credit bid on Steak n Shake's assets and "take the keys" to the Company—exactly as it had done with two other restaurant companies just months before.  This threat, which Fortress could enforce from its position as the Required Lenders, scuttled Steak n Shake's negotiations with its other Lenders and drove up the cost that Steak n Shake had to pay to retire Steak n Shake's outstanding Loans.

62.     On February 19, 2021, Steak n Shake repurchased the Loans held by Fortress and the remaining outstanding Lenders for a total amount of $102,271,683.52.

63.     In addition to driving up the cost of retiring the Loans, Fortress's conduct has forced Steak n Shake to incur significant professional fees that it would not have incurred but for Fortress's attempt to take over the business.

## Count I: Breach of Contract

64.     Steak n Shake incorporates herein the allegations of each of the previous paragraphs in this Complaint.

65.     The MCA is a valid and enforceable contract between Steak n Shake and Fortress.

66.     The MCA prohibits Fortress from using Steak n Shake's Confidential Material or knowledge of information gained through review of Confidential Material to gain a competitive or other advantage over Steak n Shake or for any purpose other than the purchase of the Properties contemplated by the parties at that time.

67.     Steak n Shake has performed all conditions precedent and duties to Fortress under the MCA.

68.     Fortress has breached its obligations under the MCA by using Steak n Shake's Confidential Material in connection with its purchase of the Loans.

69.     Steak n Shake has been damaged as a result of Fortress's breach of the MCA in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Steak n Shake respectfully requests that the Court:

1) Determine that Fortress is liable to Steak n Shake for breach of contract;
2) Find that Fortress breached the MCA by using Steak n Shake's Confidential Material for purposes not permitted under the MCA;

3) Award Steak n Shake damages sufficient to compensate it for its losses in an amount to be determined at trial;

4) Award Steak n Shake pre- and post-judgment interest;

5) Award Steak n Shake its fees and costs; and

6) Award Steak n Shake such other relief as this Court deems just and proper.

Dated: February 19, 2021

                Respectfully submitted,

                BARNES & THORNBURG LLP


                */s/ Andrew J. Detherage*
                Andrew J. Detherage (#15149-49)
                11 South Meridian Street
                Indianapolis, IN 46204
                Telephone: 317-236-1313
                Facsimile: 317-231-7433
                adetherage@btlaw.com

                -and-

                Lawrence Gerschwer (*pro hac vice* application forthcoming)
                Robert J. Boller (*pro hac vice* application forthcoming)
                Joseph A. Matteo (*pro hac vice* application forthcoming)
                445 Park Avenue, Suite 700
                New York, NY 10022
                Telephone: 646-746-2000
                Facsimile: 646-746-2001
                lgerschwer@btlaw.com
                rboller@btlaw.com
                jmatteo@btlaw.com

                *Attorneys for Steak n Shake Inc.*

# EXHIBIT A

## MUTUAL CONFIDENTIALITY AGREEMENT

STEAK N SHAKE ENTERPRISES, INC. ("**Company**") and Fortress Investment Group LLC, on behalf of itself and/or certain funds managed by it and/or its affiliates ("**Interested Party**") enter into and agree as provided in this Confidentiality Agreement (the "**Agreement**") dated as of July 17, 2020  (the "Effective Date").

1.    Subject Matter of Agreement.

(a)    Company and Interested Party (each a "**Disclosing Party**") may provide certain information to the other (each, a "**Recipient**") in connection with one or more potential real estate transactions between them (each a "**Potential Transaction**").

(b)    Each of Company and Interested Party desires to permit the other to conduct due diligence and analysis in connection with each Potential Transaction while maintaining, in accordance with this Agreement, the confidentiality of information provided by a Disclosing Party to the Recipient.

2.    Confidential Material.  As used in this Agreement, Confidential Material means all confidential and/ or proprietary business, financial, technical and other information of the Disclosing Party or its Affiliates (whether or not designated as confidential) furnished on or after the date hereof (whether orally, visually, electronically or in writing or other tangible medium) by or on behalf of the Disclosing Party to Recipient, its Affiliates or Representatives (as defined herein) in connection with or relating to any Potential Transaction.  Confidential Material will include, without limitation, all term sheets and other information relating to a Potential Transaction, reports, documents, trade secrets, technology, product information, recipes and production methods,  software, source code, financial statements, financial projections, other financial information, plans, processes, procedures, inventions, know-how, marketing, strategies, forecasts, suppliers, contractors, consultants, purchasing information, customer and pricing lists, studies, contracts and agreements, and any and all analyses, compilations, forecasts, studies, notes or other documents prepared by the Recipient or the Disclosing Party based upon or containing any such information; excluding, however, any such information that:   (i) is previously and lawfully known to Recipient or is publicly available or in the public domain at the time disclosed; (ii) becomes publicly available or enters the public domain through no fault of Recipient in breach of this agreement; (iii) becomes available to Recipient or its Representatives from a source, other than the Disclosing Party, its Affiliates or Representatives, whom the Recipient, after reasonable inquiry, does not know to be subject to a legally enforceable restriction against disclosure to the Disclosing Party with respect to such information; (iv) is independently developed by Recipient without reference to or application or use of any Confidential Material; or (v) is specifically approved in writing for release or disclosure by the Disclosing Party without restriction.  For purposes of this Agreement, the term "**Affiliate**' shall mean each person or entity controlling, controlled by or under common control with the Recipient or the Disclosing Party, as the case may be. For the avoidance of doubt, with respect to

Recipient, the term affiliate shall only mean such affiliates to whom it has provided the Confidential Material hereunder.

3. <u>Confidentiality</u>. Each Recipient agrees (i) to treat as confidential in accordance with this Agreement all Confidential Material received from the Disclosing Party, (ii) not to disclose the Confidential Material received from a Disclosing Party, and to take commercially reasonable precautions to prevent such Confidential Material from being disclosed, to anyone other than to its and its Affiliates' employees, subcontractors, officers, directors, managers, partners, potential financing sources, agents, consultants, professional advisors, members, attorneys and representatives of Recipient or its Affiliates (each a **"Representative"**) who are assisting in the due diligence or analysis on behalf of Recipient relating to a Potential Transaction and have a need to know such Confidential Material; (iii) not to use such Confidential Material or knowledge or information gained through review of Confidential Material to gain a competitive or other advantage over the Disclosing Party or for any purpose other than to assist in the internal analysis and evaluation by Recipient of the Potential Transaction; (iv) not to disclose to any person or entity other than a Representative that discussions or negotiations are contemplated or taking place regarding any Potential Transaction or any of the terms, conditions, or other facts with respect to a Potential Transaction, including its status, except as required by law; and (v) to ensure that each of its Representatives is informed of the confidential nature of the Confidential Material and is directed to comply with, all of the terms of this Agreement. Company and Interested Party agree that neither party will be obligated to provide any Confidential Material to the other party and that either party may terminate discussions of the Potential Transaction at any time.

Company's Confidential Material is a very valuable company asset. The misuse or improper disclosure of such Confidential Material could cause Company significant competitive injury. Interested Party, its Affiliates and Representatives are obligated to protect the Confidential Material and to use such information only as authorized and for the benefit of Company. Company takes reasonable measures to protect its Confidential Material.

Each Recipient's obligations set forth in this <u>Section 3</u>, and the Disclosing Party's rights and remedies with respect thereto, will remain in full force and effect for one (1) year from the date hereof.

4. <u>Original Documents and Ownership of Confidential Material</u>. Each Recipient agrees not to make copies of the Confidential Material except as necessary to assist it in its analysis of a Potential Transaction. At any time upon the Disclosing Party's request, (i) all originals and hard copies of Confidential Material will be promptly destroyed by the Recipient, and (ii) all other copies of Confidential Material in electronic or other medium, and all notes, work papers, or other materials or memoranda prepared or produced in any written, electronic or other medium by Recipient or Representatives during the course of or in connection with any investigation or analysis of the Potential Transaction based upon discussions with the Disclosing Party, its Affiliates or Representatives or upon files, documents, records, reports or other Confidential Material provided by or on behalf of the Disclosing Party, will be promptly

-2-

destroyed and Recipient will promptly confirm (email being sufficient) such destruction to the Disclosing Party in writing. Notwithstanding anything herein to the contrary, Recipient and its Representatives may retain one or more copies of the Confidential Material as may be required in accordance with its or their respective legal, compliance and/or automated backup archiving practices.

Neither disclosure by the Disclosing Party of its Confidential Material, nor anything contained in this Agreement, will in any manner convey or grant to the Recipient any ownership, license or other right or interest in or to any of the Disclosing Party's Confidential Material, including any patent, copyright, mask work, trademark, service mark or other proprietary rights or interests of the Disclosing Party. To the extent that any inventions, improvements, know-how or trade secrets (hereinafter "Developments") are first made or conceived by Recipient while working with Disclosing Party's Confidential Material or Products, whether such Developments are made jointly with Disclosing Party or alone by Recipient, Recipient hereby assigns to Disclosing Party all of its right title and interest in and to all such Developments together with whatever patents, copyrights or other forms of worldwide intellectual property, as may subsist thereon or therein, and agrees to sign, and have its employees, agents, contractors and/ or consultants sign such documents as may be necessary or desirable to vest title in such in Disclosing Party or its assignees, or to enable Disclosing Party or its assignees to better enjoy its rights to such Information.

5.    Communications to Third Parties.

Further, Interested Party acknowledges and agrees that it shall not make any comment, statement, press release, publicity or written or verbal reference of any kind regarding Interested Party's contractual relations and/or association with Company or otherwise make any oral or written reference of any kind regarding its activities hereunder or its association in any way with the Company without first obtaining the express written consent of the Chief Executive Officer of the Company.

6.    Response to Legal Process.  If a Recipient or its Representatives are requested, pursuant to subpoena or other legal process, to disclose any Confidential Material furnished by or on behalf of a Disclosing Party, Recipient will to the extent legally permissible, provide the Disclosing Party with prompt notice in order that the Disclosing Party may seek a protective order or other appropriate remedy.  If a protective order or other remedy is not obtained, or the Disclosing Party waives compliance with the provisions of this Agreement, Recipient (or its Representatives) will furnish only that portion of the Confidential Material which is legally required and will exercise its commercially reasonable efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded the Confidential Material. Notwithstanding anything herein to the contrary, Recipient and its Representatives shall not be

1418398-2

required to notify the Disclosing Party if the disclosure is made to a federal or state regulatory agency, self-regulatory organization, or governmental agency in the course of such authority's routine examinations or inspections not targeted at the Disclosing Party or the Potential Transaction.

7.     Accuracy.  Each Recipient acknowledges that neither the Disclosing Party, its Affiliates nor Representatives (i) make any representation or warranty as to the accuracy or completeness of any Confidential Material, or (ii) will incur any liability to the Recipient as a result of any reliance upon or use of Confidential Material by the Recipient.   Only those representations and warranties that may be made in a definitive written agreement for the Potential Transaction, if and when executed and delivered, and subject to any limitations and restrictions contained in such agreement, will have any legal effect.

8.     Governing Law; Jurisdiction.  This Agreement will be governed by and construed in accordance with the laws of the State of Indiana without regard to its conflict of law principles.  Each party agrees that jurisdiction of any judicial action for enforcement of or relating to this Agreement will be exclusively in, and each party agrees to submit to the jurisdiction of, the state or federal courts located in Marion County, Indiana, provided that (i) a final judgment in any such action may be enforced in any other jurisdiction by suit on the judgment, and (ii) any action for equitable relief may be brought in any other court having personal jurisdiction over the defendant. EACH PARTY WAIVES ALL RIGHTS TO A JURY TRIAL ON ANY CLAIM OR CAUSE OF ACTION BASED UPON OR RELATING TO THIS AGREEMENT.

9.     Remedies.  Each Recipient agrees that (i) a breach of this Agreement by Recipient or its Representatives may result in irreparable harm to the Disclosing Party, and monetary damages alone may not be an adequate remedy for such an actual or threatened breach, and (ii) therefore in addition to such other remedies as may be available at law, a Disclosing Party will be entitled to seek specific performance or other injunctive relief to prevent or restrain the breach of this Agreement by Recipient, its Affiliates or Representatives without the requirement to post or obtain a bond or other security or prove actual damages.

10.     Benefited Parties; Assignment.  This Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective permitted successors and assigns. Each Disclosing Party may assign its rights under this Agreement as a Disclosing Party to any successor or assign, provided that the successor or assign assumes the assignor's obligations under this Agreement. Neither Recipient may assign its rights or delegate its obligations under this Agreement as a Recipient without the prior written consent of the Disclosing Party.  No

1418398-2

assignment or delegation by a party will relieve the party from its obligations under this Agreement.

11.     Entire Agreement; Amendment.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all other prior or contemporaneous agreements and understandings, both written and oral, between the parties with respect to such subject matter.  This Agreement may be amended only by a written instrument executed by both parties.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing the Agreement to be drafted.

12.     Severability.   The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement.

13.     Headings.   The headings in this Agreement are inserted for convenience of reference only and are not intended to be part of or to affect the meaning or interpretation of this Agreement.

14.     Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which will constitute one and the same agreement.  The parties agree that facsimile or .pdf delivery of the executed document will constitute delivery of an original.

1418398-2

Executed as of the date first written above.

STEAK N SHAKE ENTERPRISES, INC.

By: _____

Printed: _____

Title: _____

"Company"

Fortress Investment Group LLC

By: _____

Printed: Michael J. Cohn

Title: Chief Compliance Officer

"Interested Party"

-6-

1418398-2